With the first case on the day calendar, we also have motions that we are separately resolving. Go ahead. Thank you. Miller, this first case. Good morning, Your Honors. My name is Vivian Shevitz, and I'm appointed to represent Nimboco Miller on this appeal. Appellant contests the use of the conscious avoidance jury instruction in this case, which suggested guilt if he should have known about the mortgage fraud scheme and did not know. The conscious avoidance charge is set forth at, well, say, the government's brief at page 18. We suggest that it is wrong, it is overbroad, and it suggests that the defendant has the burden of proof to prove that he did not actually believe that the mortgage fraud scheme existed. How do you respond to the view that the district court quite directly cautioned the jury that merely knowing or acquiescing without participation in the unlawful plan was not sufficient to support a conviction? Well, that charge was given, but that does not negate the suggestion that if he did not know of the scheme to defraud the bank or that he did not actually believe that it did not exist, that he would be liable. So it contradicted any charge that showed that he had to have been knowing an intentional member. I suggest, too, that this jury charge substituted for intent, not only knowledge. And it was wrong in that the jury was given no way of knowing how to apply it. What is it, what fact, that he did not know? If he did not know about the scheme and he avoided learning about that, well, then some fact should have been brought out and the jury should have been given some guidance, or else they were going to use it to show that he should have shown that he didn't believe it existed. I don't think — first of all, there was no objection to the instruction. Correct. So we're in the plain error, and I don't — there's no line in that instruction that suggests burden shifting. What line in the instruction says that? The last one. Read it. Read it to me. I will. It doesn't — it doesn't refer to him having to prove that, though. That just delineates what the law is. The government — as Chief Judge Katzman noted multiple times, the government must prove beyond a reasonable doubt the purpose of the conspiracy    was to commit bank fraud, and the defendant knowingly, intentionally joined that conspiracy. At another point, the fact that the act of a defendant without knowledge merely happened to further the purpose of the objective of the conspiracy does not make the defendant a member. Yes. So both the burden was on the government, and multiple times made clear that he had to have knowledge of generally what the conspiracy was. Well, he — the problem in this case is that he clearly had knowledge of something. He was a participant in the events. Right. He was a property manager. His view, his position on — when he testified was that he became involved sort of through his — This was necessary so the jury could find that he knew there was a fraud going on in the bank, but didn't know every document that — both in the opening and in the closing. The defense lawyer specifically told the jury he was duped. He didn't understand — he didn't — there's going to be no evidence that he submitted the documents. So this was a classic situation where the government was able to, and properly argued that even if he didn't submit the documents themselves, he knew it was a fraud and consciously avoided knowing what each document would say. Well, how did he know it was a fraud? Is that — that's the problem. He knew that something was going on. He had evidence that she was previously in bankruptcy. Yes. She signed documents. He signed — had her sign documents without verifying the information. He asked her to give — he gave her $5,000 for her personal information. He told her she was only going to be on the — the owner for a short period of time. Right. Didn't ask for any financial information. But he was not the bank. He was not the bank. I know, but this is all evidence that he knew that this was — what her real financial information was was irrelevant. It didn't matter if she had no money because there was going to be a fraud committed on the bank. Well, let me segue from that to our position that in light of the culpability of Wells Fargo as a whole, the settlement between Wells Fargo and the government showing that Wells Fargo was involved itself as a principal in these fraudulent matters. And I say these fraudulent matters because it was a widespread fraud. Wasn't the — wasn't the settlement — didn't that have to do with the false certification of loans eligibility for FHA insurance? Yes. It wasn't exactly the same fraud as this, but the suggestion is that Wells Fargo was — it wasn't material to them, whether somebody had money or didn't have money. And I use for that the fact that Wells Fargo knew, as you say my client did, that she had been in bankruptcy. Now, if that didn't cause Wells Fargo to deny the loan, then it seems to me there were no standards that were conveyed and there were no standards, or maybe some, that were material. And — In the letter to the district court, the argument wasn't materiality. The argument was the bank's a co-conspirator. And we know that the law is clear that even if some — I agree with you. Okay. So this materiality argument wasn't even argued to the district court. And you had Lockwood. You had the bank employee on the witness stand. Nobody asked him or her — I don't know whether these things would have mattered or not. The materiality issue could have been explored through the particular bank employee who reviewed the documents, right? Well, he was asked whether they would have granted the mortgage if they knew that she didn't intend to live there or that the document — certain things. What was the answer? The answer was, of course, we would not have granted the mortgage. But, of course, they did when they knew that there was — she had been in bankruptcy. So we have to look past what they say on the stand to protect themselves. It's a bank witness protecting Wells Fargo, then. And it's appropriately made to the — as it relates to the person who made the decision, not regarding a settlement that had nothing to do with this type of loan? Well, I'm not sure it had — the whole thing had nothing to do with this type of loan. I don't know, because the fact is that the court said, no, nothing like this is going to be admitted because it's not a defense. I agree with you. Materiality should have been expressly argued. And it — I believe it was covered. It was embraced in the — in the statement that it was a co-conspirator. It, not just the employees. That's the difference here. It's not just a rogue employee that's doing this. It's the bank. The bank is saying, nothing is material because we're going to approve whatever you hand to us. And if that's the case, nothing is material. I don't think that the bank should become a victim. If it isn't a victim, and if nothing is going to matter to it, materiality is important. But beyond that, the suspicious circumstances that my client saw, if he did, if he noticed, were the same circumstances that caused — that the bank disregarded. And I suggest that those suspicious circumstances were overly emphasized in the conscious avoidance instruction. I see that my — You'll have two minutes for rebuttal. Yes. Thank you. Good morning, Your Honors. Nomi Berenson on behalf of the United States. I'd like to begin my argument by addressing Appellant's argument that the conscious avoidance instruction was not warranted in this case. I think, as Judge Bianco pointed out, there are quite a number of circumstances, including the testimony of the nominee who testified that she was offered to be paid to engage in this scheme and to participate and give her information. Additionally, I would point the Court to the defendant's cross-examination in which, even taking him at his word and not delving into any credibility issues, what he said was, on its face, very strange. He said that he was present at the closing because his mother's boyfriend, who was a real estate broker and also had engaged him for construction work and renovation work, had told him to go there to meet someone. That person, he seemed to notice as an afterthought, then didn't that while he was there present at the closing in the building, I wasn't with her when she was doing it, she referring to the nominee, he was very clear that he had stepped outside of the actual room where the closing was right when they were about to sign papers. There was no apparent compelling reason to do so other than that he said he was hungry. And the entire purpose, really, for his presence and inserting himself into that transaction was completely unclear. His knowledge and intent were the central issues in this trial. The government's theory of the case and its evidence supported actual knowledge, but it also supported conscious avoidance in that he suddenly decided he had to leave the room, which is really akin to closing your eyes to what's going on in that room after he had been brought there and said everything in motion by bringing the nominee into the fold. With respect to the content of the charge itself, while the government does not believe that the charge is overbroad or confusing, you know, the entire jury instruction here needs to be read as a whole. The judge admonished the jury numerous times that mere presence or mere acquiescence is not enough. Someone has to knowingly and intentionally join the conspiracy. And as this Court has held in Zvoboda, the jury may rely on conscious avoidance to satisfy at least the knowledge component of intent to participate in a conspiracy. So the defendant needed to know that he was joining something that was untoward. He didn't specifically need to know that it was, you know, all of the particular details of it. And so he didn't need to know which representations in the loan documents were false or not. But he certainly had enough indicia that something was going on. And that evidence, in part, also continued until after the transaction itself, when a few days later he received a very large check for over $22,000 from the very man he was brought to meet at the closing. With respect to the evidentiary  I would argue a legally incognizable theory to the jury, which is blaming the victim and is clearly contrary to this Court's. Well, there is one theory that I don't think would be impermissible, which would be if, in fact, the bank was giving loans to everybody, no matter what the document said, then on the issue of materiality, it wouldn't be the issue of culpability of negligence. It's just all these things would be immaterial if the bank was going to give loans to everybody no matter what, right? Yes, Your Honor. I think, well, first of all, the bank witness, Mr. Lockwood, testified in a — against that. He said that there were various points of information in the loan application that were material to the bank's decision-making process, and so did the government's expert on residential loans. Additionally, I would say that there would be no reason for the defendant and his co-conspirators to have augmented the nominee's savings and financial portfolio if they really didn't believe that false information was necessary to get a loan. Regardless, in the context of the evidence that was presented at trial, any error that was made in the jury instruction on conscious avoidance was undoubtedly harmless. When you get to that, there was — counsel suggested that it wasn't clear whether this loan was the same type of loan that was part of the settlement. What's the government's position on that, that the loan program that's part of the settlement could have been the same program here? No, Your Honor. It was not, and that was — that was in the government's submission to the court below opposing the motion in Lemonet, and that was also part of the reason that the government held that it was irrelevant on its face. It had no bearing to the loan that was actually issued in this case. Unless the court has any questions, I'm happy to rest on the government's papers. Thank you. Just a short comment. Counsel stated that my client stepped out of the room at the closing to avoid, in essence, what's going on in the room. But what's going on in the room? There's a closing going on. That doesn't tell him it's a closing. There was a fraudulent document or fraudulent application, and there's reasons for him to have gone there. He went with the — with the — Michael Jumbo, who's really — it was appellant's position at trial that Michael Jumbo, the father-in-law or the stepfather, was really the culpable person, and that Andrea Murray didn't want to implicate him, so she just substituted Miller's name for the defendant's name for whatever Michael Jumbo had done. But the point is, what was going on in the room? And just avoiding — the problem here is there's no fact that anybody has identified that says, oh, if he just paid attention to that, if he did not avoid that fact, then he could be deemed to have known what this was about, that it was a scheme to defraud that bank and not a scheme to have somebody live there and get Section 8 tenants to — to pay for the house. There were a lot of other explanations that could have been had, and it's my contention that the knowledge component that can be satisfied by conscious avoidance really wasn't satisfied by what the government pointed out or by the instruction itself, because something was going on, but what? What fact was going on that the defendant knew that my client allegedly avoided? That wasn't discussed. His presence at the transaction was unclear. It was clear that the mother was there and the stepfather was there, and Andrea Murray tried to not point that out, but she agreed they were there, and it's our contention that the conscious avoidance instruction substituted for finding guilt beyond a reasonable doubt with knowledge and intent to join that conspiracy as opposed to some other thing that was going on. Thank you. Thank you both for your arguments. The Court will reserve decision.